226 So.2d 528 (1969)
E. E. RABALAIS & SON, INC., Plaintiff-Appellee,
v.
UNITED BONDING INSURANCE COMPANY, and Charles Bordelon d/b/a Bordelon Electrical Contractor, Defendants-Appellants.
No. 2800.
Court of Appeal of Louisiana, Third Circuit.
August 7, 1969.
Rehearing Denied September 16, 1969.
Writs Refused November 12, 1969.
*529 Beard, Blue, Schmitt & Treen, by Harvey C. Koch, New Orleans, for defendant-appellant.
Harold J. Brouillette, Marksville and John A. Boatner, Jr., Bunkie, for plaintiff-appellee.
Riddle & Knoll, by Charles A. Riddle, Jr., Marksville, for defendant-appellee.
Before TATE, FRUGE and MILLER, JJ.
FRUGE, Judge.
This is a suit on a building contract bond. In 1966, plaintiff, E. E. Rabalais and Son, Inc., a building contractor, undertook the construction of Mount Carmel High School in Abbeville, Louisiana. One of the defendants, Charles A. Bordelon, hereinafter referred to as "Bordelon," was a sub-contractor for electrical work with plaintiff on the job. Defendant, United Bonding Insurance Company, hereinafter referred to as "United", executed a performance bond for Bordelon. The bond guaranteed to plaintiff that Bordelon would perform his subcontract according to specifications. The amount of the bond was set at $67,200.00.
In their suit plaintiffs alleged that Bordelon defaulted on its agreement, that it was called in to complete Bordelon's part of the construction, and that therefore, "United" became liable on its bond. From the district court judgment in favor of plaintiffs, defendants have appealed to this court.
Plaintiff alleges liability on the part of United as follows:
Bordelon's bid price for the sub-contract with plaintiff was in the amount of $65,400.00. Of this amount, Bordelon was allegedly paid a total of $55,283.54. After Bordelon's default, and pursuant to an arrangement with United Rabalais itself undertook completion of Bordelon's sub-contract, which allegedly cost a total of $85,606.27, instead of the bid price of $65,400.00. To arrive at the figure which plaintiff considers United should be liable for, Rabalais deducts from the total cost what was paid to Bordelon ($85,606.27 less $55,283.54), thus resulting in a difference of $30,322.53. From this last amount is deducted the balance still owed to Bordelon under the original contract, $10,116.46, leaving an ultimate balance of $20,206.27 over and above the contract price which had been agreed to by Bordelon and Rabalais. In addition, the plaintiff sought to recover from United anticipated profits in the amount of $1,516.14, *530 attorney's fees of $7,240.08, and $150.00 for actual expenses of plaintiff's attorney. The total sought by plaintiff and that amount which the district court determined United was liable for, totals $29,112.49.
In their behalf defendants alleged a barrage of defenses. Some of these we feel are obviously without merit, but others warrant discussion.
DID BOND APPLY TO THIS CONTRACT?
United admits that it issued a performance bond naming Bordelon as principal and Rabalais as obligee. The bond was dated June 15, 1966, and reads in part:
"Whereas the Principal has entered into a certain written contract with the Obligee, dated the fifteenth day of June, 1966, to electrical work on schools, Abbeville, Louisiana, which contract is hereby referred to and made a part hereof as fully and to the same extent as if copied at length herein."
The subcontract signed by Rabalais and Bordelon was dated June 20, 1966. United therefore contends that it is relieved from liability except for a subcontract by Bordelon dated June 15, 1966. And there is admittedly none of that date.
The trial court held and we agree that the discrepancy in date was the result of a clerical error. We are impressed by the fact that this issue was not raised by defendant for more than a year after suit was filed, and not until three weeks after the trial court handed down its written reasons for judgment. It was stipulated that United's claims manager would have testified that subsequent to receiving Rabalais' notice of Bordelon's default, he met with Rabalais concerning Bordelon's electrical sub-contract on the new Catholic high school in Abbeville, and that "* * *. This was the same subcontract on which United Bonding Insurance Company was surety at the time that the contract was awarded to Bordelon".
It would be a gross injustice to permit United or its agent to receive a premium of $1,800.00 and then avoid liability on its bond as a result of a clerical error. The language of Noonan v. Independence Indemnity Company, 328 Mo. 706, 41 S.W.2d 162 (Supreme Court of Missouri), is applicable to this defense.
"Unlike a voluntary surety, a surety on such a bond is not a favorite of the law, and the rule of strictissimi juris, followed where voluntary sureties are concerned, has no application in determining defendant's liability in this case. The bond and contract in this case are to be construed most strongly in favor of plaintiff and all ambiguities must be resolved against defendant."
WAS THERE A DEFAULT?
The date of the actual notice to United by Rabalais, of the default on the subcontract by Bordelon, was August 18, 1967. As to whether or not this default affects the liability of United, they make two arguments as to its interpretation. On the one hand, United alleges that Bordelon had in fact defaulted in April of 1967, some four months prior to their actually being put in default by written and recorded notice from Rabalais to Bordelon, and therefore, United's not having been given notice of the default, the contract of bond was abandoned and United should be released from its obligations under the contract.
On the other hand, United argues that Bordelon was never in default and that the co-defendant properly performed its obligations, and that therefore, regardless of the August notice by Rabalais, United never became liable for any deficiencies on the part of Bordelon.
On the first basis, that of United's being relieved because it was not given notice of the sub-contractors alleged default as of April, 1967, United refers to conditions *531 and actions on the part of Rabalais and Bordelon which they construe as default on the part of Bordelon and/or abandonment of the contract. United refers to an assignment of revenues from the contract by Bordelon to a bank to secure a $30,000.00 loan in 1966, and to April 19, 1967, on which date Rabalais began issuing checks jointly to Bordelon and its suppliers and laborers.
After examination of the record, we agree with plaintiff that neither of these constituted an abandonment of the contract or bond. As to the assignment, defendants allege that at the beginning of the contract, in 1966, through the use of an assignment of funds to be paid it by Rabalais, Bordelon was able to secure a $30,000.00 loan from a bank; all of this without notice to United. It alleges that such constituted "advance payments" for work yet uncompleted, such being violative of the provisions of the bond, and thus sufficient to constitute a release of United from its obligations.
The evidence, we feel, leads us to conclusions opposite that of defendants. Payments were made to Bordelon only in strict compliance with the terms of the contract, that is, payments were made at a rate commensurate with the performance of work, and there were no advance payments. It is on this basis that we distinguish the cases of Southern Builders' Material Company, Inc. v. Foto, 11 La.App. 255, 122 So. 914 (La.App.Orl., 1929), and Gibbs v. Hartford Accident Indemnity Company, 62 So. 2d 599 (Fla.S.Ct., 1952).
As well, the bond itself contains no requirements that the obligee notify the surety of an assignment of proceeds by the principal, and the assignment was agreed to by Rabalais only after full assurance from Bordelon that the assignment was for the purposes of securing a loan made exclusively to help finance the job.
In considering similar allegations by the defendants during the trial on the merits, the district court rendered written reasons which we feel express fully our own conclusions. The court noted as follows:
"* * * The performance bond executed by United, contained no clause or provision, that United had to be notified if Bordelon made an assignment of benefits under his contract. Further, the loan Bordelon made with the Union Bank, was admittedly represented to be for the purchase of materials on this job (Mt. Carmel). Bordelon anticipated price rises in material; he figured bulk purchases would result in savings. Of course, it should be added, that he did not do what he said he would, with this loan. He `plugged' other holes or paid other debts of his in other businesses or transactions. But Rabalais had no way of knowing this or anticipating Bordelon was not reliable. He had always been reliable before; prior experiences with him had always been good. But, Bordelon could have done this, even if plaintiff had paid him directly in the absence of an assignment. He could have gambled his money or paid other debts with cash or checks, if such had been given him instead of to the assignee. So, it is difficult to see in what manner the execution of this assignment by plaintiff prejudiced United. There is certainly no evidence of collusion or fraud between Bordelon and plaintiff in the execution of this assignment. And good faith is evident on the part of plaintiff, when it stopped payments to the bank, under the assignment, even before Bordelon's loan was paid. The Court holds this defense is without merit also."
As to the checks being issued jointly to Bordelon and its suppliers and laborers, this was done with the knowledge and consent of Bordelon and at his request. As well the testimony in the record reveals that such practices are common in the contracting business. The testimony given by the witnesses for plaintiff does not raise issue as to the purpose of issuing the checks in this manner, other than to aid Bordelon in its *532 accounting and in dealing with its employees' and supplier. We can by no means say this should have put Rabalais on notice of a "default" situation and thus rendered him negligent in not telling United.
Plaintiff alleges that the joint payments to the sub-contractor and to its employees or suppliers changed the contract to one of employer-employee basis, and therefore the contract was abandoned. In this contention we simply see no merit.
Although we have determined that the contract was in no way changed or abandoned by the actions of Rabalais or Bordelon, we note the general rule that for an alteration of a contract to release a compensated surety, the alteration must not only be material, but must prejudice the rights of the surety. See 72 C.J.S. Principal and Surety § 124(C), page 605. Although our research could turn up only two cases on point, the law of Louisiana seems agreed with this general position. See, Natchitoches Sweet Potato Co. v. Perfection Curing Co., 153 La. 916, 96 So. 808 (1923); Diana Brick & Tile Co. v. Fidelity & Deposit Company of Md., 8 Orl.App. 76 (1910). We fail to see any prejudice to the rights of United due to the actions described previously, and thus, on this ground as well, United could not be released.
As an alternative basis on the default question, United alleges that Bordelon never did in fact default on its contract and it cites in support of this contention testimony in the record to the fact that all was well even after Bordelon received the default notice. Our impression from the record, however, follows that of the trial court in that we believe that Bordelon did in fact default on the contract. In addition, we agree with plaintiff that United was given sufficient and timely notice of this default, and at the earliest possible moment that such default was evident. We adopt as our own the following comments of the district judge:
"After hearing the evidence, the Court must conclude that Bordelon defaulted and that he was placed in default. The only basis for this special defense, as the Court sees it, is that Bordelon continued from time to time to do work on the Mt. Carmel job, after he was placed in default and even up to completion. But his working on the job was not his only obligation to Rabalais. He had the obligation to pay his labor, his supplies, and to proceed with diligence so as not to delay the general contract job. And when these obligations are considered, he, Bordelon, was clearly in default, he was put in default, and the fact that he did some work thereafter served to reduce the amount for which he and United could be held, in the final analysis. He had an interest to keep the default figures low and his continuance of work, from time to time, did in the Court's opinion, reduce the sum that he might have been held for and enured to his benefit and that of United."
On July 31, 1967, plaintiff wrote United advising it that, "While the electrical part is in an advanced stage of completion, it now becomes evidence to us that this subcontractor may not have available sufficient funds to purchase the remaining materials, pay future payrolls, and complete his obligation." Finally on August 18, 1967, Rabalais wrote to Bordelon putting that company in default. A copy of the letter was sent to United. The letter entered into evidence listed twenty-five grounds for default, and the record substantiates the majority of those grounds.
In summary, we feel that the record upholds the integrity and honesty of the plaintiff in its dealings both with Bordelon and with United. As was noted previously, the situation prior to August was not such that it could be said that plaintiff was negligent in his duty under the contract to inform the defendant of any problems on the part of the sub-contractor.
*533 THE AGREEMENT.
After United received notice of the default, a meeting was held between the representatives of United and Rabalais and at that meeting Rabalais was authorized to undertake completion of the job. Defendants contend that the figures discussed at that meeting were in the neighborhood of $5,000.00 to $6,000.00 in additional costs, wherein at completion the cost was some $20,000.00 over the original contract price. We note, as did the trial court, that at the time of the meeting the figures were at best only guesses as to what the final cost would be. At that time Bordelon had not presented to plaintiff all of the bills yet unpaid and plaintiff could only estimate for United on the basis of the last information it had from Bordelon, which information was far from accurate. It is also clear that plaintiff made no promises to United that in the end the final amount would be $5,000.00 to $6,000.00, but rather it was understood between the parties that this was only a preliminary figure. Plaintiff kept United informed all during construction informing it of the progress being made to complete Bordelon's contract and giving to United itemized costs from time to time of the development. Again, we can see no breach or change in the contract or promise on the part of Rabalais that affected in any way the ultimate liability of United on the bond.
OVERHEAD AND PROFIT.
Plaintiff claimed and was given by the district court in judgment, profit in the amount of five percent of the additional costs incurred by it in completing the contract. Plaintiff alleged and we agree that if it would not have been willing to take over the sub-contract and another company would have had to be hired, surely overhead profit would have been charged and more likely much more that what was claimed.
Rabalais assumed full responsibility and control over completion with the consent of United and in effect Rabalais became the electrical subcontractor for the completion of the job. United's bond provided that in case of default, United:
"Shall fully indemnify and save harmless the Obligee [Rabalais] from all cost and damage which the Obligee may suffer by reason of failure so to do and shall fully reimburse and repay the Obligee all outlay and expenses which the Obligee may incur in making good any such default."
We concur in the trial court's award of $1,516.14 as a five percent profit on the $30,322.53 expended by Rabalais in completing Bordelon's contract which United had bonded.
THE ATTORNEY'S FEES.
Included within the award were attorney's fees of $7,240.08, as well as the additional sum of $150 for the actual expenses of the plaintiff's attorney in connection with the present suit.
In Louisiana, attorney's fees are not allowable in the absence of statute or contract. Hernandez v. Harson, 237 La. 389, 111 So.2d 320. Under the present contract, the plaintiff was entitled to recover all "cost and damage" and "all outlay and expenses" incurred by the obligee (Rabalais) in making good the default.
In view of the strict policy of Louisiana law against allowing attorney's fees except where expressly authorized, a majority of the court holds that the plaintiff is not entitled to recover attorney's fees for his present successful suit against the defendant.[1] Because of this policy, *534 we do not construe the contractual language so as to include such exceptionally-allowed recovery. (However, we note, attorney's fees are recoverable if the performance bond so specifies. Couch on Insurance 2d, 58:114 (1966); 11 Appleman, Insurance Law and Practice, Section 6385 (1944).)
Since the present contract did not specifically authorize the obligee to recover attorney's fees incurred by reason of the default by the company issuing the performance bond, we therefore disallow the attorney's fees of $7,240.08 allowed by the trial court and $150 expenses incurred by said attorney.
DECREE.
For the foregoing reasons, we reduce the judgment of the trial court by $7,390.08; as thus amended, the judgment of the trial court is affirmed in all other respects. The defendants-appellants are to pay the costs of this appeal.
Amended and affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., dissents and assigns written reasons; FRUGE, J. dissents.
TATE, Judge (in partial dissent from denial).
The writer concurs in the denial of the application for rehearing by United, the defendant-appellant, but he dissents from the denial of the application filed by Rabalais, the plaintiff-appellee.
Rabalais complains of our original opinion's amendment of the trial court award so as to delete from it the sum of $7,240.09, representing attorney's fees and expenses. We disallowed this award upon our holding that the bonding contract issued by United did not specifically authorize the obligee (Rabalais) to recover attorney's fees incurred by reason of the subcontractor's default. As our opinion noted, my brother FRUGE and myself did not agree with this deletion, and we join in this dissent, feeling that the majority has incorrectly disallowed recovery of these attorney's fee damages provided by contract.
In our opinion, the majority has incorrectly applied the general rule of Louisiana law that the court may not assess attorney's fees as damages in the absence of statute or contract (Hernandez v. Harson, 237 La. 389, 111 So.2d 320), because here the contract provided that the obligee Rabalais could recover them.
Our original opinion noted that the bond issued by United (for a substantial premium) guaranteed to the obligee Rabalais that the subcontractor would perform according to specifications or else that United would save Rabalais harmless from any default. (Of course, under the terms of the bond, United could recover back from the subcontractor any amounts so paid.)
United's bond specifically provided that, in the event of default, United "shall fully indemnify and save harmless the Obligee [Rabalais] from all cost and damage which the Obligee may suffer by reason of failure so to do and shall fully reimburse and repay the Obligee all outlay and expenses which the Obligee may incur in making good any such default." (Italics ours.)
We think that under this unambiguous agreement United has agreed to indemnify Rabalais from "all cost and damages" and "all outlay and expenses" resulting from the subcontractor's default. This includes attorney's fees required to enforce the claim(s) under the performance bond. In the commonsense meaning of the "outlays and expenses" and "cost and damage" sustained by reason of the subcontractor's default, this large and foreseeable item should certainly be regarded as intended by the parties as among the damages and costs and expenses the obligee Rabalais was protected against.
Our Civil Code provides that the courts should enforce the words of a contract as the law between the parties when they are *535 clear and explicit as here. Article 1945. Further, words in a contract should be interpreted according to their common and usual signification. Article 1946.
But even if the agreement is ambiguous, it should be interpreted in the light of the common intention of the parties, Article 1950, and it further must be interpreted against the party (United) who has incurred the obligation, Article 1957, and who has prepared the agreement, Articles 1957, 1958, Kuhn v. Stan A. Plauche Real Estate Co., 249 La. 85, 185 So.2d 210.
Normally, the surety who issues the performance bond is liable for attorney's fee damages or outlay incurred by the obligee as a result of the default, such as those in the present case. Trinity Universal Insurance Co. v. Normand, La.App.3d Cir., 220 So.2d 583.
In the Normand case, the description of the obligations for which the surety was liable may have specifically included attorney's fees as among those outlays for which the obligor was liable. However, we are aware of no legal principle which holds that, as a matter of contract-law, the magic words "attorney's fees" must be specified as among those included within "all cost and damage" and "all outlay and expenses" resulting from a default which the surety contractually agrees to "fully indemnify and save harmless."
We may say that no Louisiana statutory provision or decision requires the denial of attorney's fee-damages to the obligee (Rabalais). The misapplication of the principle that attorney's fees are not awarded in the absence of contract overlooks that here a contract exists which, interpreted by the usual principles of Louisiana law, provides for United to pay to Rabalais any attorney's fee cost or outlay occasioned by the subcontractor's fault.
We therefore respectfully dissent from the denial of the plaintiff-appellant's application for rehearing.
NOTES
[1] Although a majority of the panel feels that attorney's fees are within the scope of the contractual obligation, as construed against the obligor which issued the performance bond for a premium, we defer to the views of a majority of the entire court.