252 So.2d 488 (1971)
Roy ROBERIE, Plaintiff and Appellee-Appellant,
v.
SINCLAIR REFINING COMPANY et al., Defendants and Appellants-Appellees.
No. 3442.
Court of Appeal of Louisiana, Third Circuit.
August 20, 1971.
Rehearings Denied September 23, 1971.
*490 Christovich & Kearney by A. R. Christovich, Jr., New Orleans, for defendants-appellants-appellees.
Daniel J. McGee, Mamou, Andrew Vidrine, Church Point, as co-counsel for plaintiff-appellee-appellant.
Davidson, Meaux, Onebane & Donohoe by Timothy J. McNamara and Robert L. Cabes, Lafayette, Lewis & Lewis by John M. Shaw, Opelousas, for defendant-appellee-appellant.
Guillory, Guillory & Guillory by A. Frank McGee, Eunice, Taylor, Porter, Brooks, Fuller & Phillips by Frank M. Coates, Jr., Baton Rouge, Voorhies, Labbe, Fontenot, Leonard & McGlasson by H. Lee Leonard, Lafayette, Landry, Watkins, Cousin & Bonin by William O. Bonin, New Iberia, for defendant-appellee.
Before FRUGÉ, SAVOY and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
Plaintiff, Roy Roberie, was employed by Ashy Construction Company, Inc. as an oiler on a dragline. On December 31, 1965 he and the dragline operator, Harry Hawkins, were sent to back-fill an abandoned drilling site on which Rowan Drilling Company, Inc. had drilled a dry well. Rowan had drilled the well under a contract with Sinclair Oil & Gas Company, and the latter was operating under a mineral lease obtained through an agent, James E. Grady, from Sterling Sugars, Inc., owner of the land in question. Ashy Construction Company, Inc. had been hired by Sinclair to clean up the site following the unsuccessful drilling operations.
Plaintiff and Hawkins arrived on the scene around ten o'clock in the morning of December 31, 1965 and busied themselves by pumping water out of a small pool. Shortly thereafter one Jess Burnette, a superintendent for Ashy, arrived and ordered plaintiff to gather up the debris that was scattered about the site and burn it. *491 This debris included empty cans, broken boards, etc., but consisted primarily of empty paper bags which had once held drilling mud and other chemicals used in the drilling operation. There was a pile of such bags already made which measured some 10 feet in diameter and three or four feet in height, which plaintiff ignited and proceeded to throw the other bags upon. While Hawkins continued to operate the water pump, plaintiff gathered nearly 100 of the scattered bags and then they stopped for lunch.
Following the lunch break they resumed their duties. The first bag that plaintiff approached was almost entirely buried in dirt with only its corners protruding, so he seized two corners with both hands and pulled. The bag tore and a liquid splashed in plaintiff's right eye causing an immediate burning sensation and intense pain. Plaintiff dropped to his knees screaming and holding his face, and Hawkins, alerted by the screams, ran over to him. He attempted to wash plaintiff's eyes with water but seeing that his efforts were futile, he drove plaintiff to a physician in Franklin, Louisiana. There plaintiff received emergency medical treatment and he was referred to Dr. Merrick Wyble, an ophthalmologist in Opelousas, Louisiana. On the way to Opelousas, Hawkins and plaintiff stopped to look at the offending bag and on removing the dirt from it, Hawkins reads the words "caustic soda" thereon.
Under the care of Dr. Wyble plaintiff underwent surgical procedures and lengthy hospital stays, but nevertheless lost all sight in his right eye. Accordingly he initiated the present litigation seeking damages for his injuries and what he alleged to be their consequences.
By an original and two supplemental petitions, plaintiff impleaded as principal or alternative defendants Sinclair and Sinclair Refining Company and their insurer, Hartford Accident & Indemnity Company, Sterling Sugars, Inc. and its insurer, Commercial Union Insurance Company of New York; Rowan and Magnet Cove Barium Corporation, now known as Dresser Industries, Inc. who sold Sinclair the caustic soda used on the site in question, and the insurer of both Rowan and Dresser, The Fidelity & Casualty Company of New York; and Ashy and its insurer, Great American Insurance Company. These defendants filed various third party demands by which they sought indemnification and defense from each other. Also by third party demands, James E. Grady and Pittsburgh Plate Glass Company who may have manufactured the caustic soda involved, were added as defendants.
There was extensive pretrial activity in the course of which the suit against Sinclair Refining Company was dismissed on a showing that insofar as the lease in question was concerned, it had no connection with Sinclair Oil & Gas Company. Finally a trial on the merits was had, following which James E. Grady was dismissed on motion of Sterling who had brought him in as a third party defendant, it being stipulated that he was acting as an agent for Sinclair in procuring the lease and that Sinclair therefore stood in his shoes for purposes of the lease. The trial court rendered judgment in favor of plaintiff and against Rowan, finding the sole cause of the accident to be the negligence of the latter, and dismissing all third party demands for indemnity and attorney's fees. By separate judgment the trial court awarded Ashy all sums which it had paid plaintiff under workmen's compensation.
The judgment was appealed by plaintiff, Rowan, Sterling and Sinclair, as well as by the insurers of Rowan and Sterling. Pittsburgh Plate Glass Company, and Sterling, together with its insurer, filed answers to the appeals taken against them, as did Hartford Accident and Indemnity Company, insurer of Sinclair. Subsequently Pittsburgh Plate Glass Company was dismissed from the case on motion of the attorneys for Sterling and its insurer, whose appeal was the only one affecting that party.
*492 We examine first the question of whether Rowan was guilty of negligence. There was a great deal of testimony in this regard, most of it contradictory, with the only real point of agreement being that caustic soda, or sodium hydroxide, is an extremely dangerous chemical with highly corrosive qualities. It dissolves readily in water and, in concentrated form, immediately destroys any tissues it comes in contact with. The caustic soda used in oilfield operations is 66 per cent pure sodium hydroxide and is therefore highly concentrated.
The oilfield workers who testified stated that caustic soda is used in drilling operations in combination with drilling mud. A small percentage of caustic soda is mixed in with the mud as it is being used. Although they differed regarding the rigidity of the rule, they indicated that each crew customarily burns the empty bags of both drilling mud and caustic soda that they have used during each shift. They also differed as to whether caustic soda bags were treated in a manner different from that accorded the innocuous mud bags.
Specifically, the employees of Rowan who worked on the site in question testified that it is not necessarily the custom to burn all bags before leaving a drilling site, but that they often leave piles of bags unburned. They stated that they do not treat caustic soda bags any differently from other bags and that their primary objective in discarding them is simply to get them out of the way.
An assistant divisional superintendent for Rowan, who visited this site approximately twice a week during the drilling operations, testified that 12,760 bags of all types of material were used on this job, of which 559 contained caustic soda. The divisional superintendent for Rowan testified that roughly 100 of these caustic soda bags were used in combating a threatened blowout which occurred during the week of August 30, 1965, and that because of the danger of a blowout the bags could not be burned. He further stated that Hurricane Betsy struck the area on September 9, 1965, shortly after the danger of a blowout was over.
Additionally there was testimony from two men who were presumably schooled in safety measures for drilling operations. The first of these, Paul S. Guillory, was a safety engineer on a consultant basis who was accepted by the court as an expert in oil field safety. He stated that caustic soda bags cannot be emptied completely as flakes will remain in them. He said that each drilling crew should burn the bags that they have used at the end of their shift and considered it the exception rather than the rule for drilling crews to leave empty caustic soda bags on a site. In fact, he considered it no safer to leave caustic soda bags around a drilling site than leaving dynamite around such a site, and he agreed that to do so would be a flagrant violation of safety procedures. He also expressed the opinion that empty caustic soda bags should be handled only with a pitchfork, and wearing goggles, rubber gloves, and a rubber apron as protection.
The second of these men was Baltha Hughes, Jr., safety director for Circle Drilling Company, a party not involved in the litigation. In direct contradiction of Mr. Guillory's testimony, he stated that it is common practice for drilling crews to leave empty bags, including caustic soda bags, lying about an abandoned drilling site, and that he would expect to find such bags on a site such as the one in question. He went on to say that he would require men handling caustic soda to wear only goggles as protection and he discounted any need of rubber gloves, aprons, etc. Further, he stated that there exists a manual published by the American Association of Oilwell Drilling Contractors which, although it contains a section dealing with safety, says nothing about the manner of dealing with empty caustic soda bags; that his own company has no rules on the subject; and that his men routinely handle such bags with their bare hands and he knows of no injuries that have ever resulted from such a practice.
*493 It is well settled in our law that one who handles an inherently dangerous substance has the obligation to exercise an extraordinary degree of care. Waters v. Southern Farm Bureau Casualty Ins. Co., La.App., 212 So.2d 487, writ refused, 252 La. 900, 214 So.2d 720; Surry v. Arkansas Louisiana Gas Co., La.App., 170 So.2d 133, writ refused, 247 La. 358, 171 So.2d 477; Holland v. St. Paul Mercury Ins. Co., La. App., 135 So.2d 145. The trial judge, who saw and heard the witnesses, found Rowan's handling of the caustic soda bags to be inconsistent with the burden placed upon it by the aforesaid legal principle. We are not disposed to overturn his findings. It was well established that caustic soda is an inherently dangerous chemical and that Rowan's employees took no pains to assure the safe disposal of the bags that formerly contained it and very probably still contained particles or flakes of it when discarded.
Nor do Rowan's efforts to establish that it handled the empty bags in the customary manner avail its cause. While custom may be considered in determining whether sufficient care has been exercised, it is not conclusive or controlling of that determination since the customary manner of doing things may well involve negligence, and to allow custom to control the outcome could create a false standard of care. Larned v. Wallace, La.App., 146 So. 2d 434; Pennington v. Justiss-Mears Oil Co., La.App., 123 So.2d 625.
Likewise the alleged danger of a blowout and the subsequent occurrence of Hurricane Betsy are without exculpatory significance. At least two days passed from the time that the threat of a blowout ceased to exist and the onslaught of the hurricane, certainly enough time to gather up and burn the loose bags. More significantly, by the testimony of Rowan's own employees, it was not the custom of that company to concern itself with the destruction of the empty bags. Thus Rowan's assistant divisional superintendent whose testimony was above referred to, also said: "* * * we have nothing to do with cleaning up of the location, that's not our job, we are well drillers and we don't have any specific obligation to police the area, only to keep it in a safe working condition for the people that's dismantling the rig and our people that's working with us."
Defendant Rowan complains that even if it was negligent, its negligence was not a proximate cause of plaintiff's injury. In this regard we emphasize the extremely dangerous nature of caustic soda and the consequent high degree of care required of those using it. In such circumstances of inherently dangerous substances, our courts have occasionally gone so far as to apply the doctrine of absolute liability, allowing plaintiff to recover even when defendant was shown to have used the dangerous substance in the customary and accepted manner and to be without fault. See for example Fontenot v. Magnolia Petroleum Co., 227 La. 866, 80 So.2d 845. We opine however, as did our brothers of the First Circuit in Williams v. American Mutual Liability Ins. Co., La.App., 121 So.2d 545, that we need not go so far, as the harm which ultimately resulted from Rowan's negligence was reasonably foreseeable to Rowan. We see no great innovation or surprise in the act of an unskilled and inexperienced laborer picking up an empty bag, lying among many other empty bags, in the course of cleaning up an abandoned drilling site. Moisture is not a stranger to our geographical area, and it is surely not beyond the realm of foreseeability that it could enter a bag containing particles of caustic soda and combine with them to form the liquid which entered plaintiff's eye when he yanked on the bag. Such being the case we concur in the trial court's finding of negligence on the part of Rowan which was a proximate cause of plaintiff's injuries.
Defendant Rowan also argues that plaintiff was contributorily negligent. We disagree.
Except for three months in 1964 that he had spent working for Ashy, plaintiff had *494 been a farmer all of his life. He had been working for Ashy for approximately another three months when the accident occurred, but had never before been sent to clean up a drilling site. He in fact had never been on a drilling site, except to watch at a distance from curiosity, and he had never seen bags of oilfield chemicals before. Thus plaintiff had no way of knowing that he was dealing with dangerous substances. While it is true that had he taken the time to read each bag he could have ascertained that some contained caustic soda, we are not inclined to say that he should have done so. There were in excess of 100 bags scattered about the site, a very small percentage of which had contained caustic soda. To require a laborer with but a sixth grade education to read each bag would be to impose too onerous a burden. In any event the bag that actually caused the injury was partially covered with dirt, and it is highly unlikely that plaintiff could have read any warnings thereon prior to pulling it out, even had he attempted to do so. Thus defendant's efforts to show that plaintiff knew the dangerous propensities of lye, a less concentrated form of sodium hydroxide, are unavailing.
Plaintiff was ignorant of the danger he faced and it cannot be reasonably said that he should have discovered it. Accordingly, he was free from contributory negligence.
We turn now to the issue of quantum, put before us by both plaintiff and Rowan, who seek an increase and decrease respectively, in the amounts awarded by the trial court.
On October 14, 1965, some 2½ months prior to plaintiff's accident, Mrs. Mary Lou Belleaudeau, a nurse, performed an eye test on him in connection with his employment with Ashy. She found his vision to be 20/25 in the right eye and 20/20 in the left eye. Two physicians testified regarding plaintiff's visual ability following the accident. Dr. Merrick Wyble, the ophthalmologist who was plaintiff's treating physician above referred to, stated that plaintiff can see nothing with his right eye and at best can only detect light therewith. His left eye, according to Dr. Wyble, has 20/70 vision correctible to 20/25. Dr. Lee Sonnier, an eye, ear, nose and throat specialist, who examined plaintiff at the request of defendant Sterling and its insurer, testified that he was totally blind in the right eye and had 20/70 vision in the left eye correctible to 20/20.
Dr. Wyble testified that besides the week spent in the St. Landry Clinic immediately following his accident, plaintiff was hospitalized in the Opelousas General Hospital from February 18, 1966 through February 27, 1966; March 16, 1966 through March 19, 1966; March 23 through April 2, 1966; and April 5, 1966 through April 23, 1966. Besides his hospital stays, plaintiff had visited Dr. Wyble's office in excess of seventy times by August 1, 1968.
Dr. Wyble's original examination of plaintiff resulted in a diagnosis of severe alkali burn to the right eye and periorbital area. The left eye was essentially normal. Conservative treatments and radiation to the injured eye failed to produce the desired results and a corneal transplant was effected. At first the transplant gave signs of being a success and plaintiff was able to count fingers with his right eye, but in approximately 10 days the iris was noted to be adhering to the posterior surface of the cornea and the latter was becoming cloudy again. Surgery was then performed to remove the iris from the cornea but it proved unsuccessful. Following a second unsuccessful attempt to separate the iris from the cornea, it was decided that the situation warranted another corneal transplant and that was performed. The second transplant, like the first, was successful for a short time, and plaintiff could again see fingers with his right eye. Soon, however, it too, became edematous and cloudy and finally it became completely opaque. At that point all further efforts to restore vision to plaintiff's right eye were abandoned as being futile.
At about that same time, i. e., May of 1966, plaintiff began complaining of decreased *495 vision in his left eye, and examination revealed that eye to be capable only of 20/70 vision. When Dr. Wyble was presented with a hypothetical question that stated plaintiff's vision in his left eye to have been 20/20 on October 14, 1965 and the date of the accident to have been December 31, 1965, the doctor expressed the opinion that the left eye's decrease in visual ability to 20/70 approximately eight months later was probably also due to the effects of the accident. He explained that the chemical which injured plaintiff's right eye was absorbed by the bloodstream and probably produced some lens change in the left eye causing plaintiff to become nearsighted in that eye.
The doctor stated that plaintiff has additional problems in that he has an abnormal growth of granulation tissue over his right eye which reacts to such factors as wind, light, and dust in such a manner as to cause exaggerated discomfort. Also the eyelashes on that eye tend to turn inward and irritate the eye, thus necessitating visits to the doctor's office for their removal. Additionally plaintiff has permanent loss of stereoscopic vision, or depth perception.
The prognosis offered by Dr. Wyble was that the right eye will never improve and might progress to complete shrinkage. The left eye had shown no progression of the myopia and its condition will probably remain stationary. This doctor felt that, although remote, there was a possibility that sympathetic ophthalmia could appear in the left eye and that accordingly plaintiff should be watched in the future. His total fees at the time of trial amounted to $1935.20 and he anticipated the necessity of further charges.
Dr. Sonnier disagreed with Dr. Wyble's opinion that the chemical which destroyed the plaintiff's right eye also damaged his left eye, stating that it is impossible for sodium hydroxide to be absorbed by the tissue of the body and circulate through the blood stream. Also this physician disputed the idea that glare or light could bother plaintiff since it was his opinion that plaintiff could not see light with his right eye. He considered the problem that plaintiff was having with eyelashes entering his eye to be minimal since he felt that plaintiff had no sensation in his right eye and he said that the problem in any event could be corrected by a simple operation. The fact that plaintiff's left eye had gone from 20/20 vision to 20/70 vision in some nine months did not impress him as he considered such a change to be in no way unusual. Finally it was Dr. Sonnier's opinion that plaintiff was not disabled but could do manual labor of the type he had done previously.
We expressed the opposite opinion in this plaintiff's prior action for workmen's compensation benefits entitled Roberie v. Ashy Construction Company, La.App., 215 So.2d 857, writ refused, 253 La. 323, 217 So.2d 414. There we found that plaintiff was not a skilled worker and that the loss of an eye is not necessarily productive of total permanent disability in all types of employment. Nevertheless we held that because of the problems peculiar to plaintiff's case, he was totally and permanently disabled from returning to the type of work he was doing.
No showing has been made that plaintiff is qualified for any occupation other than those involving outdoor manual labor, and he has been proved disabled from engaging in that type of work. In so holding the trial judge apparently preferred the testimony of Dr. Wyble over that of Dr. Sonnier. He saw and heard the witnesses and his conclusions in this regard are not characterized by such manifest error as would justify our overturning them. We therefore concur with the trial court in finding plaintiff to be disabled.
The district judge awarded plaintiff the sum of $104,199.99 representing $22,000.00 for his disfigurement, pain, suffering, loss of sight in his right eye, and impaired vision of his left eye; $65,000.00 for loss of future earnings; $4,800.00 per year from the date of the accident until the date *496 of trial; past medical expenses of $1935.20; and future medical expenses of $624.00.
Plaintiff was 43 years of age at the time of the accident. Although he had worked for Ashy only for three months immediately preceding the accident, every indication in the testimony is that he intended to stay with Ashy that time, and not return to farming. In the approximately six months total time that he worked for Ashy, plaintiff earned a total of $2029.51. This would make his yearly earnings about $4,059.02, had he continued to work for Ashy. Considering his age we can reasonably anticipate that he would have spent another 22 years at his job.
It is evident from the district judge's reasons for judgment that he determined plaintiff's loss of future wages on the basis of annual wages averaging $4800.00. We see from Ashy's payroll records, however, that plaintiff was only averaging $4059.02 per year during the time that he worked for Ashy. We are therefore of the opinion that the trial judge overestimated plaintiff's earning capacity and that an award of $50,000.00 for lost earnings would more closely approximate a just result.
For the same reasons the trial court's award of $4800.00 per year from the date of the accident to the date of trial, must be reduced to $4,059.02 per year for the same period.
We consider the award for general damages of $22,000.00, in view of the number of surgical procedures undergone by plaintiff and the continuing problems that he is having with both his blind eye and his left eye, to be within the realm of propriety. While it does appear to us to be rather high, it is not so excessive as to justify a reduction therein. La.C.C. Art. 1934(3); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127.
Finally, we are of the opinion that the future medical expenses in the amount of $624.00 awarded by the trial judge based on Dr. Wyble's testimony, are supported by the evidence. Although the damages therefor could not be exactly calculated, plaintiff does have a legal right to recovery for this item. There is, of course, the possibility that surgical removal of the eye could become necessary, and Dr. Wyble estimated the expense to be approximately from $750.00 to $800.00. Whether or not the enucleation is performed, however, the doctor testified that plaintiff would require medical observation indefinitely and stated his charges for office visits to be $6.00 and that at times, when he does a refraction, he charges $10.00. Considering this evidence in light of the recent Supreme Court case of Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151, we conclude that the trial judge did not abuse his discretion in making this award.
The claims for attorney's fees of Sterling and its insurer against Sinclair and its insurer, and of Sinclair and its insurer against Rowan and Ashy and their insurers were properly denied by the trial court. Sterling bases its claim against Sinclair on a provision of the lease agreement between them which reads:
"The Lessee shall be responsible for all damages caused by Lessee's operations."
Sinclair bases its claim against Rowan on a clause in their contract which provides that Rowan agrees: "To hold Operator [Sinclair] harmless from any and all liability for damages to the person and/or property of any and all persons resulting from the operations of contractor [Rowan] hereunder."
Sinclair's claim against Ashy is based on a provision in their contract which reads as follows:
"Contractor [Ashy] shall save harmless and indemnify Sinclair from all liabilities and claims for loss, damage or injury to persons or property in any manner arising out of or in connection with the work being performed hereunder, whether or not said liabilities and claims are *497 covered in whole or in part by the insurance hereinafter provided."
As can readily be seen none of those liability clauses provide specifically for attorney's fees. Our jurisprudence is well settled that attorney's fees may not be allowed unless they are particularly authorized by law or by the contract between the parties. Chauvin v. La Hitte, 229 La. 94, 85 So.2d 43 and cases cited therein. This court has specifically held that general liability clauses which require one party to indemnify another and hold him harmless from all cost and damage which the latter might suffer, do not encompass liability for attorney's fees within their purview, and we consider ourselves bound by our prior decision in this regard. E. E. Rabalais & Son, Inc. v. United Bonding Ins. Co., La.App., 226 So.2d 528, writ refused, 254 La. 862, 227 So.2d 597. If it were intended between the parties that attorney's fees were to be included in the hold harmless and liability clauses, it would have been a simple matter to so specifically provide.
Although plaintiff asks us to hold the other defendants in this case liable to him, he does not favor us with much argument on this point. We have found Rowan negligent and any discussion of possible negligence on the part of Ashy or Sinclair is made moot by La.R.S. 23:1032 and 23:1061. There is no evidence in the record such as would justify an imposition of liability on the executive officers of those corporations or on any of the other defendants and thus overturning the findings of the trial court in this regard.
Finally we reject the claim for damages for frivolous appeal on the part of Hartford Accident and Indemnity Company since there is no showing that the appeal of Sterling and Commercial Union Insurance Company was either characterized by insincerity or taken solely for the purpose of delay. Johnson v. Iowa Rice Dryer, Inc., La.App., 226 So.2d 194.
For the above and foregoing reasons the judgment of the trial court is amended so as to reduce the amount awarded to plaintiff from $104,199.99 to $84,421.00 and in all other respects is affirmed.
Amended and affirmed.

On Application for Rehearing
PER CURIAM.
In his application for a rehearing, counsel for plaintiff raises the question of whether there is error in our computation of damages. He correctly points out that we neglected to award his client the sum of $1,690.83 stipulated by counsel to be the amount paid by Ashy Construction Company, Inc. for plaintiff's medical expenses excluding those incurred as a result of treatment by Dr. Wyble.
Additionally our attention is directed to a mathematical error in our computation of wages lost during the interval between the date of the accident and the date of trial. As stated in our original opinion these wages are to be calculated on the basis of $4,059.02 per year. Two years and seven months having elapsed during the stated interval, the correct amount to be awarded for this item is $10,485.79.
The net effect of these corrections is to raise the amount awarded to plaintiff in our original opinion from $84,421.00 to $86,735.82, and our judgment is hereby so amended.
Other arguments made by plaintiff in his application are without merit and are rejected, and otherwise than as herein amended, our original decision remains the same.
Although other parties to this suit also filed applications for a rehearing, none of them present any novel points for our consideration and accordingly all will be denied.
Subject to the changes made by this per curiam decision, all applications for a rehearing are denied.