BLANCHE, Judge.
Plaintiff-appellant, Darlene R. Alexander, appeals a judgment of the Nineteenth Judicial District Court which denied her wrongful death action against the defendants-appellees, I. G. Butler, J. C. Pollard, Willard Green, Chris L. Mehl, Henry-Smith, J. M. Gill, Robert Herzog, and The Travelers Indemnity Company.
In 1968 the plaintiffs husband was hired by Ethyl Corporation to work in its polyvinyl chloride plant at Baton Rouge, Louisiana.
The plant’s purpose is to convert vinyl chloride monomer,[1] a dangerous chlorinated hydrocarbon gas, into polyvinyl chloride granules, a type of plastic which Ethyl sells to other manufacturers for the production of plastic products. One step in the production of the granules results in a slurry composed of the granules and water. This slurry is stored in seven large stainless steel tanks twenty feet high by fourteen feet in diameter.
In the next production step, the slurry is transported by pipeline to a dryer unit for removal of the water and any unreacted vinyl chloride monomer which is trapped in the pores of the polyvinyl chloride granules.
A small amount of the slurry usually, remains in the tank after -its contents are removed to the dryer unit. If the residue is great, the tank is washed out by the workmen using a common water hose. This is done in order to avoid cross-contamination with other products subsequently stored in the same tank.
To accomplish this washing, the workman ascends to the top of the tank, inserts the water hose into a manway opening, rotates the hose at 360 degrees, and thereby rinses the residue from the walls of the tank into the bottom where it flows into a drainage ditch. The manway is a raised opening similar to a barrel which protrudes approximately two feet above the tank’s top.
At 2:30 P.M. on December 2, 1973, the plaintiff’s husband, Peter M. Alexander, reported for work as usual. At approximately 4:00 P.M. he was found on the top of tank “D” with his upper body slumped into the manway and his lower body and legs on the outside. All parties agreed that at the time of the accident Alexander was apparently in the process of rinsing the inside of the tank because water was running from the hose which was protruding through the manway into the tank. Also, a water flush valve that facilitates the washing of the slurry into the disposal ditch had been opened and was flooding the tank from the bottom.
All attempts to revive Alexander failed. It is undisputed that the ultimate cause of death was inhalation of vinyl chloride monomer.
The plaintiff received $8,826 in workmen’s compensation benefits as a result of her husband’s death. She subsequently brought this suit against many of the corporate executives and supervisors in Ethyl’s chain of command. However, after various legal maneuvers, only the above-named defendants who were the deceased’s immediate supervisory personnel, remain.
It was stipulated at trial that any judgment against said defendants would be subject to a credit for the workmen’s compensation benefits already paid.
jThere is no dispute that at the time of this accident vinyl chloride monomer was known to be a dangerous gas. The evidence established that vinyl chloride monomer has been used experimentally as an *715 anesthetic agent and that continuous inhalation of it can have adverse effects on the human body. It has a pungent odor that can be detected in concentrations of 400-800 parts per million. At one point it was used as a propellant in aerosol cans. The first adverse effect noticed by a person in contact with a reactionable concentration of the monomer is dizziness. This is followed by a drunken feeling, nausea, then finally blackout and death. Other than by odor, the gas gives no warning of its presence.
In finding for the defendants, the trial court stated that they “acted reasonably under the circumstances, based on years of experience at Ethyl and other plants and further based on the available scientific information, in believing that the washing operation could be performed safely by an operator exercising reasonable care in the performance of his job who was observing these simple and basic precautions, together with the general rule — if you smell vinyl chloride, get out.” (Reasons for Judgment, p. 72)
I.
The legal requirements necessary to impose liability upon executive or supervisory personnel have "been clarified recently in Canter v. Koehring Company, 283 So.2d 716 (La.Sup.Ct.1973). After acknowledging that a duty must be owed by the executive to the injured worker, the Court stated that one criterion for imposing individual liability is the executive’s breach of duty through personal fault:
“ * * * The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstances — whether such failure be due to malfeasance, misfeasance, or nonfea-sance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.” (283 So.2d at 721)
The plaintiff has not contended that the safety procedures established by the Ethyl Corporation for this vinyl chloride plant were not being followed at the time of the accident. She does, however, contend that those procedures were inadequate. She argues, in essence, that since the individual defendants herein were skilled in handling this potentially dangerous gas,[2] they, by the exercise of the ordinary prudence of similarly skilled men, knew or should have known that the said safety standards were inadequate. Accordingly, since the defendants did not advise her husband that the procedure for washing the storage tank was unsafe, they breached their duty to him and in accordance with the above-quoted language of Canter, supra, they are liable for his death.
Alternatively, plaintiff contends that the trial judge failed to require the defendants to display the high degree of care which is required of those engaged in the manufacture and sale of an inherently dangerous material.
To substantiate her contention that the washing procedure was unsafe, the plaintiff relied heavily upon the testimony of Dr. Clayton D. Callihan, recognized by the court as an expert in the field of chemical engineering, particularly in the field of bioengineering, polymerization of hydrocarbons, and plant design.
*716 Dr. Callihan explained that after the tank is drained of the slurry, the remaining polyvinyl chloride granules slowly release the unreacted vinyl chloride monomer from their pores. The monomer then builds up in the tank and even though it is heavier than air, its high diffusion rate causes it to become evenly dispersed throughout the 20,000 gallon tank. According to Dr. Calli-han, the concentration reaches approximately 180,000 parts per million inside the tank.
He then commented that the diffusion rate and the spraying of water into the tank causes the monomer to escape through the manway and subjects the workmen to a much higher concentration than 500 parts per million, which was the accepted standard for human exposure for an eight-hour period at the time of the accident.
He surmised that Alexander was exposed to a high concentration of the monomer, collapsed with his upper body hanging into the manway, and subsequently died from continued inhalation of a high concentration of the gas inside the tank.
On cross-examination Dr. Callihan admitted that he did not know the exact concentration an individual could withstand before experiencing an adverse reaction, nor could he calculate the concentration of the gas on the outside of the tank at the manway opening during a typical washing operation.
To rebut plaintiff’s contentions, the defendants introduced an article form the Industrial Hygiene Journal, May-June 1963, by Drs. Lester, Greenberg and Adams, entitled “Effects of Single and Repeated Exposures of Humans and Rats to Vinyl Chloride.” The article established that in the six humans tested, concentrations varying from 8,000 to 12,000 parts per million could be inhaled for five minutes with no effect. Also, from the responses of the individuals it was evident that “vinyl chloride causes clear-cut intoxicating symptoms which can serve as adequate warning signs of its presence.”
To establish the actual concentration to which a workman is subjected at the man-way opening, defendant Mehl stated that he tested the exit of the manway to tank “D” approximately two hours after the accident and found 200 parts per million concentration of the monomer.
The next day an operation was performed that was similar to that done by the plaintiff’s husband. When the lower water valve was opened, as decedent had done, and the water hose inserted into the manway, the reading at the top of the manway was. approximately 800 parts per million. Mehl surmised that the difference in the two readings was due to the passage of time.
To establish the actual position of the workman’s body during the washing operation and, therefore, establish the concentration of gas to which he is exposed, Mehl testified that there is no requirement to wash the^ tank completely clean and the workmen have no reason to subject themselves to higher than 800 parts per million concentration by leaning over into the manway to inspect the sides. Because of the position of the manway, the workman can completely circle it and visually observe the inside walls while standing. He then squats down with his head on the outside of the manway, inserts the water hose and rotates it 360 degrees to wash the sides. Mehl concluded that a workman performing the job in this manner could not fall into the manway as did the decedent.
All the defendants who testified stated that the washing was a routine operation performed by only one workman and that even though the method for performing the actual rinsing with the water hose was done in a slightly different manner by each workman, they all insisted that every man was instructed never to put his head into *717 the manway because of the possibility of inhaling large quantities of the gas. Also implicit in the instructions was the rule that the workman was never to allow his body to he positioned where he would fall into the manway if he fainted. That instruction was obviously disregarded by the deceased, as he was found with his upper body inside the manway hole.
The trial judge found as a fact that even though there were variances concerning body position when performing the rinsing job, they were “insignificant.”
It was established by defendant, I. G. Butler, that it takes approximately three to five minutes to perform the washing operation.
We note that the plaintiff did not call any witnesses to refute this contention of the defendants, and the only evidence submitted at the trial to establish the actual concentration of vinyl chloride monomer required to produce an adverse reaction in the human body was contained in the Industrial Hygiene Journal, It is apparent from the Journal that concentrations greatly in excess of those measured by defendant Mehl at the exit of the manway could be inhaled by humans for five minutes, which is the maximum time required to complete the entire washing process with no adverse effect.
The standard of care demanded of these executive officer defendants by the Canter case, supra, is necessarily related to the degree of danger inherent in the substance under their care, Hartford Fire Insurance Company v. Captain, 278 So.2d 821 (La.App. 2nd Cir. 1973). In view of the foregoing testimony and evidence brought out at the trial of this matter, we conclude that any workman performing the decedent’s job in accordance with the instructions of the defendants would not be subjected to what was considered at the time of the accident to be a dangerously high concentration of vinyl chloride monomer.
Based upon the foregoing, we conclude that the procedures utilized to wash these storage tanks conformed to the standard of care required under the circumstances.
II.
We find unrefuted evidence that the decedent was instructed concerning the safety procedures established by the plant.
Defendants Smith and Mehl, both chemical engineers and supervisors in the decedent’s chain of command, testified that all employees were thoroughly instructed as to the dangers of vinyl chloride monomer and that periodic checks were made to insure that the safety procedures established at the plant were being followed.
Ethyl’s vinyl chloride section conducts paid safety meetings once a month for each shift. Defendant, I. G. Butler, decedent’s immediate supervisor on the day of the accident, stated the decedent obviously attended those meetings since he was never “called on the carpet” for failure to attend, as is the plant policy.
It is also obvious from the trial testimony that each workman is instructed concerning the dangerous propensities of the gas and told to immediately leave an area if he begins experiencing the tell-tale symptoms of vinyl chloride monomer intoxication. It is uncontroverted that face masks supplying fresh air were available throughout the area to any worker who might feel the adverse effects of the gas. In fact, some such masks were within 50 to 75 feet of the tank “D” manway.
We conclude that the workmen were adequately instructed concerning safety measures to be taken when confronted by a hazardous condition in the plant. Therefore, each worker, once he became aware that he was experiencing dizziness or other adverse effects from inhalation of the gas, was trained to extricate himself from the danger.
*718 In this regard the plaintiff would have this Court hold that her husband was overcome by the gas and passed out with his upper body inside of the manway before he could react to the danger or extricate himself therefrom. Implicit in such a holding would be the conclusion that the safety rules failed to consider that such a rapid reaction to the gas would deprive the workman of his ability to remove himself from the area of exposure. As such, the safety rules would be inadequate and, therefore, liability would be imposed upon the defendants.
However, there is absolutely nothing in the record to indicate that vinyl chloride monomer, regardless of its concentration, causes immediate loss of consciousness which would have prevented this workman from removing himself from the manway opening. It is uncontested that during the decedent’s four years of employment at the plant he performed this procedure a number of times and never once complained to his supervisors that he considered it to be dangerous or that he had experienced an adverse reaction to the gas.
III.
Although not controlling, an additional factor which may be utilized to determine the degree of care which must be exercised is the standard of the industry, Roberie v. Sinclair Refining Company, 252 So.2d 488 (La.App. 3rd Cir. 1971); Pitre v. Employers Liability Assurance Corporation, 234 So.2d 847 (La.App. 1st Cir. 1970). The evidence established that the washing method utilized by Ethyl’s plant in Baton Rouge was standard in the industry and that up until the time of this unfortunate accident the Vinyl Chloride Safety Association, a worldwide association of companies engaged in the manufacture of vinyl chloride, had never received a report of a workman being overcome by fumes while performing this particular operation. In this regard, the evidence indicates there had never been a case of dizziness or other untoward reaction reported at Ethyl’s Baton Rouge plant. We conclude that the procedure conformed to the standards of the industry, and this strengthens our conclusion that the defendants did not breach their duty to plaintiff’s husband.
IV.
Another theory postulated by Dr. Callihan was that since vinyl chloride monomer is nonbiodegradable, that is, the body is incapable of disposing of it once it is inhaled, the decedent’s continued exposure to it made him more susceptible and the last exposure caused a sensitivity reaction resulting in death.
This theory was refuted by the testimony of Dr. Albert L. McQuown, a pathologist who examined tissue taken from the body of the deceased. Based on his studies of vinyl chloride, he concluded that the cause of death was not a sensitivity reaction as advocated by Dr. Callihan.
Dr. McQuown concluded that death was due to the dangerous nature of the substance and specifically denied that it resulted from a sensitivity reaction.
Without elaborating upon the other requirements of the Canter case, supra, we are of the opinion that under the circumstances of this case the plaintiff has failed to show that the defendants breached a duty to her husband which caused his death. Absent a breach of duty, there can be no liability imposed upon them.
For the above and foregoing reasons, the judgment of the trial court is affirmed, at appellant’s cost.
Affirmed.

. C2H3CI, a clear liquid under pressure and a colorless gas at atmospheric levels.

. Defendants Smith and Mehl are engineers. The record discloses no special qualifications for defendants Pollard, Butler and Green except for their employment in supervisory positions at the plant. Defendants Gill and Herzog did not testify and the record does not disclose their capabilities.