146 So.2d 434 (1962)
Arthur Fred LARNED, III., Plaintiff & Appellant,
v.
E. M. "Hy" WALLACE, d/b/a Hy's Casing Crew and Fidelity and Casualty Company of New York, Defendants and Appellees.
No. 653.
Court of Appeal of Louisiana, Third Circuit.
November 5, 1962.
Rehearing Denied November 28, 1962.
Certiorari Denied January 25, 1963.
*435 Douglas J. Nehrbass, Lafayette, for plaintiff-appellant.
Davidson, Meaux, Onebane & Donohoe, by James E. Diaz, Lafayette, for intervenor-appellant.
Felix A. DeJean, Jr., Opelousas, for defendant-appellee.
Before FRUGÉ, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a tort action. Plaintiff alleges that while he was working on an oil drilling rig an employee of the defendant, Hy's Casing Crew, negligently caused a heavy casing tong to fall on his foot. An intervention was filed by Travelers Insurance Company, as workmen's compensation insurer of plaintiff's employer, Weatherford Oil Tools Company, Inc., for compensation benefits paid to plaintiff. Defendant's answer denies actionable negligence but does not alternatively plead contributory negligence as a bar to plaintiff's recovery. After trial on the merits, the district judge, without assigning written reasons, rendered judgment in favor of defendant, dismissing plaintiff's suit. From this judgment, both the plaintiff and the intervenor have appealed.
There are three principal issues: First, was defendant's employee, Walter Roy, negligent in removing the casing tongs by a method which required that they be raised over the heads of plaintiff and the other men working on the floor of the rig? Second, was Roy negligent in failing to warn plaintiff that the tongs were being raised over his head? Third, was this negligence a legal or proximate cause of the accident?
The record shows that Owens Drilling Company owned the rig and was drilling the well. Owens had subcontracted with Hy's Casing Crew, the defendant herein, for the performance of the casing operation and with Weatherford Oil Tools Company, Inc., plaintiff's employer, for the furnishing of "centralizers and scratchers" used to stabilize and secure the casing in the hole.
The last piece of casing had been installed and it became necessary to remove the casing tongs from the rig. These tongs weigh approximately 1,000 pounds and are about 3 feet in length and 2½ feet in width. They are power-driven and are used to clamp onto each successive joint of casing pipe and screw it on, before it is lowered into the hole. To facilitate the operation of these heavy tongs, a counter-weight is used. A cable runs from the tongs through a pulley, part way up on the derrick, and then back down through a hole in the rig *436 floor to a weight bucket below. The rig floor is a few feet above the ground. The tongs are normally operated at a height of about 4 to 5 feet above the floor, depending on the height of the tong operator. This cable from the tongs to the weight bucket is called the tongline.
The tongs are attached to the tongline by means of a clevis pin (a U-shaped piece of iron with holes in the ends through which a pin is run and screwed). In order to unscrew this clevis pin and remove the tongs from the tongline, it is necessary to relieve the weight from the clevis pin. Since a weight is suspended on each end of the line, the weight can be relieved on either end. According to the expert testimony, there are three methods by which this can be done. The first is to attach the catline (a line running to the top of the derrick and used to lift heavy objects) directly to the weight bucket, or to the tongline above the hole in the floor, and then to raise the weight bucket until the tongs rest on the floor of the rig with sufficient slack in the tongline for the clevis pin to be unscrewed. This method does not require that the tongs be raised higher than the heads of the men, but it cannot be used on some rigs because the weight bucket will strike the floor of the rig before the tongs reach the floor. The second method is to attach the catline directly to the tongs and simply raise them higher than the heads of the men until the weight bucket hits the ground, thereby giving the necessary slack in the tongline to remove the clevis pin. In this method the tongs are then lowered by the catline to the floor of the rig. The third method, which could be used, is to secure the weight bucket in the raised position with another line, after which the catline can be attached to the tongs and raised the distance of about 1 foot necessary to give slack in the tongline. This third method also does not require that the tongs be raised above the heads of the men.
Regardless of which of these procedures is used, the catline must be employed. The catline belongs to and is operated by an employee of the drilling company. It is a device using physical advantage to lift heavy tools and other objects. The catline runs from the floor of the rig up through a pulley at the top of the derrick and then back down to the cathead, a cylinder or drum which is turned by the main draw works of the rig. The end of the catline which goes to the cathead is made of rope, in order that it will slip on the cathead, around which it is wrapped anywhere from about 2 to 6 times, depending on the weight of the object to be raised. When an object is to be lifted, the operator wraps the catline around the cathead a sufficient number of wraps, that when he pulls on the catline and applies friction, by tightening the catline around the cathead, the object can be raised, as the draw works turn the cathead.
At the time of the accident, Mr. Walter Roy, an employee of the defendant, Hy's Casing Crew, was the tong operator and as such it was his responsibility, on completion of the casing job, to see that the tongs were removed from the rig and returned to his employer. It was Mr. Roy who decided which method to use to unfasten the tongs from the tongline. Insofar as the evidence shows, any one of the three methods described above could have been used. Mr. Roy used Method #2. He attached the catline directly to the tongs and then signaled the catline operator, who raised them from 7 to 10 feet above the floor, thereby causing the weight bucket to hit the ground and the tongline to become sufficiently slack that the tongs could be removed. Mr. Roy then climbed up and stood with one foot on the side of the derrick and one foot on the tongs (then suspended by the catline) and unfastened the clevis pin of the tongline. He then signaled the cathead operator to lower the tongs and Roy stepped back on the derrick. It was at this time that the tongs fell the distance of 7 to 10 feet and capsized onto plaintiff's foot.
Although there is some dispute about it, it is our opinion the evidence shows the cause of the tongs falling was the catline operator "losing a wrap". The expert witnesses *437 testified that if a catline operator allows one wrap of his rope to come off the cathead, while lifting a heavy weight, it is very likely that he will be unable to hold the weight up with the remaining wraps. The object will then fall to the floor. One witness testified that he actually saw the cathead operator lose a wrap at the time of the accident. Unfortunately the cathead operator himself could not be located to testify.
At the time of the accident, plaintiff was standing on the floor of the rig, watching the weight indicator and mud gauge, which was part of his job. He was standing in a place where he had a right to be. No warning was given to him by anyone, nor did he know that the tongs were being raised or lowered.
Under the above general facts, the first issue is whether the actions of Roy, in raising the tongs by this method above the head of plaintiff without warning, constituted negligence.
Applicable here is the definition of negligence as conduct creating an unreasonable risk to others, found in 65 C.J.S. Negligence 313 as follows:
"It has been held that negligence does not exist unless there is a reasonable likelihood of danger as a consequence of the act complained of, and it must be measured in the light of some danger that is reasonably to be anticipated. The duty to use care is based on the knowledge of danger, and negligence or want of ordinary care includes reasonable anticipation of harm. So negligence has been defined as conduct which creates an undue risk of harm or injury to others; the failure to use such care as is necessary to avoid a danger which should and could have been anticipated, by reason of which plaintiff has suffered injury."
This same concept of negligence is expressed by our Supreme Court in the recent case of Brown v. Liberty Mutual Ins. Co., 234 La. 860, 101 So.2d 696 as follows:
"Liability for damages under Article 2315 of the Civil Code is founded upon fault and whether or not fault exists depends upon the facts and circumstances presented in each particular case. In determining fault, a commonsense test is to be appliedthat ishow would a reasonably prudent man have acted or what precautions would he have taken if faced with similar conditions and circumstances? The degree of care to be exercised must always be commensurate with the foreseeable dangers confronting the alleged wrongdoer."
We have little difficulty in concluding that it was negligent to raise the tongs above plaintiff's head without warning. The expert testimony shows that on a drilling rig it is considered unsafe to raise a heavy object over a man's head without warning. While it is recognized that this is inherently a dangerous type of work where many risks must be taken, all of the experts, with the possible exception of defendant's witness, Mr. Henry, testified to the effect that even on a drilling rig it is considered unduly hazardous to raise a heavy object over a man's head without warning him, for fear that something might break or slip and cause the object to fall.
Defendant contends that Roy had no duty to warn plaintiff, arguing that any such duty was that of the cathead operator, or the driller, who operated the catline and actually raised and lowered the tongs. The evidence is uncontradicted that it was Roy's responsibility to see that the tongs were removed from the rig and returned to his employer. Roy chose the method to do this; he fastened the tongs to the catline; he signaled the cathead operator to raise them; he went up in the derrick and unfastened them from the tongline; and then he signaled the cathead operator to lower them. It is apparent that he was playing a substantial role, if not the controlling role, in *438 this procedure. We think that reasonable safety precautions required that before Mr. Roy signaled the cathead operator to raise the tongs or to lower them, he should have looked to see whether anyone was in a position of danger and, if so, he should have warned them. Roy created this hazard and he should have seen plaintiff in a position of danger. He should have foreseen that if he gave the cathead operator the signal to raise and lower, the operator might obey the signal without looking to see for himself whether anyone was in danger. Possibly both Roy and the cathead operator had this duty to see plaintiff and to warn him, but certainly Roy, who created the hazard and was playing such a substantial part in this procedure, had the duty.
Although defendant argues that there was no dangerous situation created, and no duty to warn, because plaintiff was not standing directly under the tongs, we think plaintiff was sufficiently close that he was obviously in danger. The tongs hit the floor and capsized onto plaintiff's foot, which means that they must have hit within 3 feet of where the plaintiff was standing. The mere fact that the plaintiff was hit shows that he was in a dangerous position. Furthermore, defendant's expert witness, Mr. Hochendel, testified that he thought it would be hazardous to raise tongs within 4 or 5 feet of where a man is standing.
Also bearing on the question of negligence is the issue of whether other methods were available to unfasten the tongs. Although defendant argues the method used was the only one possible on this particular rig, it is our view that the evidence does not support this factual conclusion. Mr. Roy finally admitted under cross-examination that he didn't try to use the two safer methods. He didn't know whether the tongs would go all the way to the floor with the weight bucket raised as high as it would go. Actually, the evidence does not show one way or the other whether the tongs would go to the floor. However, even if they would not go to the floor, there were still two possible procedures, i. e., either #2 or #3 as above described. In Method #2, the one actually used by Roy, it is necessary to raise the tongs above the heads of the people working on the platform but, in Method #3, where the weight bucket is tied in the raised position, the tongs would only have to be raised about one foot and would not be over the heads of the men. The legal effect of Roy's choosing the unsafe, rather than a safe procedure, is that he thereby created a dangerous situation and assumed the duty of taking reasonable precautions that this method could be used without injury to the men on the floor of the rig.
The defendant argues that Roy's method of removing the tongs is frequently used in the oilfields and therefore no negligence can be charged to him for following this customary procedure. We agree the evidence shows this was a customary way of removing tongs but the evidence likewise shows, as pointed out above, that it was not considered customary or safe to raise a heavy object over a man's head without warning. Furthermore, the law is well established that although custom may be considered in determining whether sufficient care has been exercised, it is not conclusive or controlling, because the customary way of doing a thing may be a negligent way, and may create a false standard of care. Once negligence is established, it cannot be justified by custom. Pennington v. Justiss-Mears Oil Co., La.App., 123 So.2d 625; Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627.
The next issue is whether defendant's negligence was a legal or "proximate" cause of the accident. At the outset we will consider defendant's contention that after Mr. Roy unfastened the tongs, stepped back on the derrick and signaled the cathead operator to lower the catline, Roy no longer had any control over the operation. In effect, this argument is that any negligence on Roy's part had become passive and therefore not a legal cause of the accident. This contention must fall in view of the recent *439 case of Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298, in which our Supreme Court has rejected the doctrine of "passive negligence" as placing undue emphasis on the chronology of the negligent acts complained of.
In the Dixie Drive-it case, supra, a truck, illegally parked on a paved portion of the highway, was struck by the driver of an overtaking vehicle, who negligently failed to see the stalled truck in time to stop. In holding that the negligence of the parked truck was one of the legal causes of the accident, the court used the following tests: (1) Was the negligent conduct a cause-in-fact, that is, was it such a substantial factor that the accident would not have occurred without it? (2) Was the plaintiff a member of the group sought to be protected by the violated statute or rule?
Applying these tests to the instant case, it is apparent that the negligent acts of Roy constituted a cause-in-fact of the accident. The accident would not have occurred had not Roy chosen this hazardous method of removing the tongs. Also, it would not have occurred if Roy had warned plaintiff that the tongs were being raised over his head. As to the second test, plaintiff was a member of the group sought to be protected by the safety rule that a warning be given before a heavy object is raised over the head of anyone on the rig.
Similar to the instant case, on the issue of proximate cause, is Mason v. Herrin Transfer & Warehouse Co., 168 So. 331 (2nd Cir. La.App.1936) in which then Judge Hamiter, now Justice Hamiter, was the organ of the court. There, employees of the defendant corporation, who were installing boilers in a building, left a heavy chain wedged between a block of wood and a purlin (a piece of timber laid horizontally to support the common rafters of a roof) which had been temporarily removed in the construction process. The chain was above the heads of men working below. An employee of a third party later moved the purlin, allowing the chain to fall on plaintiff below. In holding that the act of defendant's employees, in leaving the chain in this dangerous position, was an "efficient cause of the injury", the court quoted from the case of The Joseph B. Thomas, 86 F. 658, 46 L.R.A. 58 the following general rule of law:
"Negligence may be the proximate cause of an injury of which it is not the sole or immediate cause. If appellants' negligence concurred with some other event (other than the fault of appellee) to produce the injury, so that it clearly appears that but for such negligence the injury would not have happened, and both circumstances are closely connected with the injury in the order of events, the appellants would be responsible, though their negligent act was not the nearest cause in the order of time. The rule is given in 1 Shear. & R. Neg. (4th Ed.) § 31, as follows:
"`The mere fact that another person concurs or cooperates in producing the injury, or contributes thereto, in any degree, whether large or small, is of no importance. * * * It is immaterial how many others have been in fault, if the defendant's act was an efficient cause of the injury.'
"In 16 Am. & Eng.Enc.Law, 440, it is said:
"`It is no defense, in an action for a negligent injury, that the negligence of the third person, or an inevitable accident, or an inanimate thing, contributed to cause the injury of the plaintiff, if the negligence of the defendant was an efficient cause of the injury. In such cases the fact that some other cause operates with the negligence of the defendant in producing the injury does not relieve the defendant from liability. His original wrong concurring with some other cause, and both operating proximately at the same time in the *440 production of the injury, he is liable to respond in damages, whether the other cause was a guilty or an innocent one.'"
We turn now to a consideration of the amount of damages to be awarded plaintiff. The casing tongs, weighing approximately 1,000 pounds, fell to the floor of the rig and capsized onto plaintiff's left great toe. No useful purpose would be served by discussing the expert medical testimony because there were only two such witnesses and they are in substantial agreement. Dr. Walter B. Comeaux, a specialist in general surgery, was the treating physician and he called in consultation Dr. William Lewis Mueleman, a specialist in orthopedics. Their testimony shows plaintiff suffered a compound, comminuted fracture of the bones of the left great toe requiring that it be amputated through the metatarsal phalangeal joint. Subsequently a small amount of skin grafting was performed to promote faster healing. About 6 months after the injury the foot had to be reoperated and small pieces of dead bone removed because a small draining sinus had persisted in part of the amputation scar.
Plaintiff spent a total of 37 days in the hospital and was on crutches about 2½ months. He was finally discharged by the doctors 10 months after the accident. At the time of his discharge, the only residual effects of the injury were a small area of anesthesia at the amputation site and a sensation of imbalance in walking. However, it was the opinion of the doctors that the plaintiff would in time overcome the imbalance. The permanent disability to the foot was estimated at about 18%.
Dr. Meuleman testified that by the time of the trial in the lower court, which was about 2½ years after the accident, plaintiff had overcome his imbalance and was able to return to his normal physical activities. On the other hand, plaintiff testified at the trial that he still had a sensation of imbalance and that he suffered excessive fatigue on standing or walking for a long period of time. He stated that he could formerly play 18 holes of golf without tiring, but that he now could play only 9 and also that his bowling score had been effected. Our conclusion is that the evidence does not sustain plaintiff's position that he suffered any disability to work or perform his normal physical activities beyond the date of the trial which was about 2½ years after the accident.
The medical expense has been stipulated to be the sum of $2,691.45. As to pain, suffering and disability, we think an award of $5,000 is appropriate under the facts of the instant case and is in keeping with awards which have been made in similar cases. For instance, in the recent case of Treadway v. Marphis, 73 So.2d 215 (Orleans Ct. of App.1954) $4,000 was awarded to the plaintiff whose injuries consisted of fractures of the lower left leg and ankle, causing the muscles to become atrophied and requiring prolonged orthopedic treatments to obtain only partial use of the ankle. In Plaisance v. Pellerin, 102 So.2d 499 (1st Cir. La.App.1958) plaintiff was awarded $6,000 where a severe injury to the knee resulted in 25% permanent loss of use of the leg. In Brantley v. City of Baton Rouge, 98 So.2d 824 (1st Cir. La.App. 1957) $2,500 was awarded to a 50 year old lady who suffered 10% permanent disability as a result of traumatic arthritis of the ankle and foot.
As to loss of income, the evidence shows that at the time of the injury plaintiff was earning a salary of $500 a month plus a car and travel expense. His income tax returns for 3 or 4 years preceding the date of the accident show that he had an annual income of about $5,000 per year. As shown above, we have found that he was disabled from doing this type of oilfield work for 2½ years. However, the evidence shows that for the first 8 months after the accident he was paid his full salary, that is, a total of $4,000. Furthermore, the evidence shows that when he left Weatherford Oil Tools in October of 1959 he went to work for a building maintenance corporation in Lake Charles and later for another concern in *441 Lafayette earning approximately $3,000 a year.
Thus we see that if plaintiff had continued to work for Weatherford Oil Tools for the 2½ years of his disability he would have earned the sum of $12,500 but we must deduct the sum of $4,000 which he received for the 8 month period he was paid his full salary by Weatherford, and also the sum of $5,500 which he received while working for other concerns during the remaining 22 months of his disability. This results in the sum of $3,000 which we feel plaintiff has shown as the amount of income he lost due to his injury.
Recapitulating, the damages recoverable are: Medical expense, $2,691.45; pain, suffering and disability, $5,000; and loss of earnings, $3,000. The damages total $10,691.45.
As regards the intervention, it was stipulated that The Travelers Insurance Company had paid to plaintiff weekly compensation and medical expenses totaling $6,196.56. Under the provisions of LSA-R.S. 23:1103, the damages recovered herein from defendants must be so apportioned, that the claim of the intervenor for compensation actually paid shall take precedence over that of the injured employee. However, in this case there is an excess over and above the amount necessary to reimburse the intervenor employer, which excess must be assessed in favor of the injured employee.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the intervenor, The Travelers Insurance Company, and against the defendants, E. M. "Hy" Wallace, d/b/a Hy's Casing Crew, and the Fidelity and Casualty Company of New York, jointly severally and in solido for the sum of $6,196.45, together with legal interest thereon from date of judicial demand until paid, the said intervenor to be paid by preference over the plaintiff. It is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Arthur Fred Larned, III., and against the said defendants, jointly, severally and in solido for the sum of $4,495, together with legal interest thereon from date of judicial demand until paid. All costs in the lower court, as well as the costs of this appeal, are assessed against the defendants.
Reversed and rendered.

On Application for Rehearing.
En Banc. Rehearing denied.