391 So.2d 898 (1980)
Eullis H. JOHNSON, Plaintiff-Appellee,
v.
HARRY JARRED, INC., Walsh Watts, Inc., David Billingsley d/b/a Billingsley Engineering Company, Inc., Gahagan Gas Company, Inc., Traders & General Insurance Company, Ronald L. Sawyer and Jack Sterret, Jr., Defendants-Appellants.
No. 14337.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1980.
*899 Abadie & Kohnke by Peter J. Abadie, Jr., New Orleans, for plaintiff-appellee.
Mayer, Smith & Roberts by Walter O. Hunter, Jr., Shreveport, for defendants-appellants.
Before HALL, JASPER E. JONES and FRANK W. JONES, Jr., JJ.
JASPER E. JONES, Judge.
This is an executive officer negligence action based upon a natural gas blowout and fire which occurred during the drilling of a gas well on October 26, 1973 in Red River Parish. The cause of action arose *900 prior to the enactment of Act 147 of 1976 amending LSA-R.S. 23:1032, which now precludes such actions.
Defendants, Ronald L. Sawyer, President of Sawyer Drilling & Service, Inc., and Traders & General Insurance Company, his liability insurer and the workmen's compensation carrier of Sawyer Drilling & Service, Inc., appeal a judgment rendered against them for personal injury damages sustained by plaintiff in the gas well blowout in the amount of $225,000, based upon the jury verdict in this amount. The insurer was given credit in the judgment for the workmen's compensation and medical expenses paid by it prior to trial. Defendants contend there was no evidence to support the judgment against them. The insurer alternatively contends that the judgment should have contained a provision giving credit for all compensation benefits paid until the judgment is finally satisfied, and further that the judgment should contain a provision that all workmen's compensation liability subsequently accruing in favor of plaintiff and against the insurer be offset by that portion of the judgment in excess of the amount of actual offset to which Traders is entitled to at the time the judgment is satisfied.
Plaintiff answers the appeal contending the jury had deducted the credit to which the insurer was entitled (for compensation and medical expenses paid) from the sum which plaintiff was entitled before the jury determined the amount of the award to be paid by defendants.
Plaintiff was employed by Sawyer Drilling & Service, Inc. as a roughneck on Russ Realty Co. # 2 well which was being drilled in the Gahagan gas field in Red River Parish, Louisiana. On the afternoon of his injury plaintiff was working on the floor of the rig with his supervisor, L. M. Sinclair, the driller, and a fellow roughneck, Percy Denkins. As the three of them prepared to make a connection (add on an additional stem of drill pipe) they observed beneath the floor of the drilling platform bubbling from the hole being drilled, and very soon after making this observation concluded the bubbling was the result of natural gas coming from the hole which was then at a depth of between 900 and 1000 ft. Because of the danger created by the presence of the natural gas, the driller instructed plaintiff and Denkins to shut off the machinery operating the rig. Denkins declined, and hastily departed from the floor of the rig. The driller cut off three of four diesel engines used in running the rig while plaintiff cut off the power plant. The driller was attempting to stop the fourth diesel engine when it backfired and an explosion and fire immediately occurred, which blew plaintiff from the rig onto the ground. Though he was severely burned, he crawled to safety under a flame of fire that extended some 70 ft. from the floor of the drilling rig. Denkins returned to the floor of the rig and removed the driller who was severely burned and then carried the driller and plaintiff several miles from the rig where they were met by an ambulance which carried them to a hospital in Bossier Parish. The driller died several days later from injuries sustained by him in the explosion and fire. The well cratered and the drilling rig was a total loss. Plaintiff was totally and permanently disabled to return to any type of outside work as a result of his severe burns.
The estimates of the witnesses as to the time between the time of their realization that gas was coming from the drilled hole and the occurrence of the explosion and fire varied from 1½ minutes to 4 minutes. Plaintiff, inter alia, contended that Sawyer, President of his employer, was negligent in that he failed to provide the necessary safety devices which would have made it possible for plaintiff and his co-employees to have prevented the occurrence of the explosion and ensuing fire which seriously injured plaintiff. The principal safety devices which plaintiff contended were absent from the drilling rig were the existence of a blowout preventer, a gas detector, heavier drilling mud which would have prevented the gas from coming to the surface, and a centralized switch which could have automatically cut off all four of the diesel engines without requiring that they be cut off individually.
*901 Plaintiff's testimony and that of his co-worker, Denkins, both of whom had extensive experience in drilling of oil and gas wells for more than 20 years, was that these safety devices would have avoided the occurrence of the accident. They testified these safety devices should have been available on the drilling rig. This testimony also was to the effect that Sawyer had designed the drilling program that was in effect at the time of the accident.
After plaintiff had presented this evidence and rested, defendants filed a motion for a directed verdict, contending that plaintiff had failed to produce any evidence that Traders was the liability insurer of Sawyer, and further contending that there was no evidence produced by plaintiff which established that Sawyer was guilty of any negligence that brought about the accident which caused his injury. Defendants' attorney in his opening statement to the jury stated that Traders & General was the liability insurer of Sawyer. The trial court overruled defendants' motion for a directed verdict. Defendants then produced the testimony of Sawyer, a Petroleum Engineer with some geological experience. He testified that he had designed the program for the drilling of Pugh-Huckaby No. 1 Well, which was a producer at 7200 ft., and which was located approximately 3000 ft. from the well where plaintiff sustained his injury. He testified that in the preparation of the determination of the manner in which this well was to be drilled, that he made extensive investigations into findings determined by prior drilling activities in the area from the following sources:
(1) Louisiana Department of Conservation reports applicable to Gahagan gas field;
(2) The logs of numerous other wells drilled in the Gahagan gas field;
(3) Scout reports of other oil companies concerning their experiences and findings on wells drilled by them;
(4) The records of mud logging companies concerning their findings in connection with services rendered by them on wells drilled in the Gahagan gas field; and
(5) Records of drill bit suppliers concerning information compiled by them in connection with the use of their drill bits used in drilling wells in the Gahagan gas field.
Sawyer testified that his review of the evidence from the above outlined sources established he could anticipate no unusual geological drilling problems until the drilling reached a depth of 3500 ft. where salt water would be encountered. Sawyer testified that based upon this information, he had drilled a surface hole on the Pugh-Huckaby well to a depth of 1800 ft. before installing surface casing. He testified that until he reached the 1800 ft. depth and installed his surface casing, that he installed no conductor pipe, no blowout preventers, no gas detection devices, nor used any heavier mud to control any gas encountered in drilling of the hole. He testified that no unusual geological findings were encountered other than the expected salt water at 3500 ft. in the drilling of Pugh-Huckaby well which was completed without incident at a depth of approximately 7200 ft. Sawyer testified that he adopted the same drilling program for Russ # 2 that he used for the Pugh well. He had a blowout preventer on location of Russ # 2 which he intended to install on the surface casing which he intended to place in the hole after the drilling reached a depth of 1800 ft.
The evidence establishes that sometimes in the drilling of oil and gas wells that there is installed at the very commencement of the drilling operation a large diameter pipe that goes into the hole for a depth of some 300 ft. which is cemented in place and the drill stem and surface casing installed in the hole is placed inside of the conductor pipe. The conductor pipe has a two-fold purpose, one of which is to prevent cave-ins around the hole at relatively shallow depths immediately following its commencement, and the other purpose of the conductor pipe is to provide a pipe upon which gas blowout preventers can be installed prior to the later installation of surface casing.
*902 Although this record is extremely scant on the function of a blowout preventer, we deduce that such a device, when installed upon a conductor pipe cemented into the earth can be closed by a drilling crew to shut off the escape of gas encountered in the drilling operation to prevent a fire and a resulting explosion and cratering of the well. Sawyer testified he seldom used a conductor pipe and even more seldom used it with blowout preventers. He acknowledged that he had drilled some wells for other operators who had required him to install conductor pipe equipped with blowout preventers when drilling commenced.
The evidence further establishes that on the offset well drilled to replace the one on which plaintiff was injured and the first three subsequent wells following it drilled by plaintiff's employer, that conductor pipe was installed on each of them equipped with blowout preventers.
Lee Kyzer, a Petroleum Engineer of extensive experience, testified that he seldom used a conductor pipe with a blowout preventer attached in the drilling operations supervised by him. He acknowledged that while drilling wells for Gulf Oil Company he had been required to use conductor pipe equipped with blowout preventers. His testimony with regard to this requirement of Gulf establishes that Gulf made a practice:
"... to use blowout preventers. Not that they were afraid of anything, it was just their practice to use blowout preventers." [emphasis ours]. Id. Tr. 278.
Both Sawyer and Kyzer acknowledged that gas detection devices were frequently used on drilling rigs, but both of them testified that they were never installed until surface casing was first set. These devices have a buzzer which was placed upon the floor of the rig to immediately warn the drill crew that gas had been encountered in the drilling hole. Sawyer and Kyzer both testified they were unaware of any single switch which could have been installed upon a drilling rig, the turning off of which would stop simultaneously all diesel engines used in the drilling operation. The testimony of Sawyer and his expert witness, Kyzer, was corroborated by Jack M. Sterret, Jr., the drilling supervisor for plaintiff's employer, who was also a defendant herein, but who was adjudicated free of any negligence by the jury.
Defendants assign as error (1) the failure of the trial judge to sustain their motion for a directed verdict, (2) they contend the jury was guilty of manifest error and clearly wrong in determining that the evidence establishes plaintiff's injuries were sustained by him as result of an accident caused by negligence of Ronald L. Sawyer, and (3) in the alternative, the insurer assigns as error the failure of the judgment to give Traders credit for workmen's compensation benefits paid subsequent to trial date, and for future accruing liability for compensation benefits.

SHOULD THE MOTION FOR A DIRECTED VERDICT HAVE BEEN GRANTED?
The authority for a directed verdict is contained in LSA-C.C.P. art. 1810 A:
"A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right to do so and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. A motion for a directed verdict shall state the specific grounds therefor. The order of the court granting a motion for a directed verdict is effective without any assent of the jury."
This provision in our law has as its source the Federal Rules of Civil Procedure and our jurisprudence has established that the criteria used by the federal courts for determining whether or not to sustain a motion for directed verdict is the correct test to be applied by our courts in applying the provisions of LSA-C.C.P. art. 1810 A. See Madison v. Travelers Insurance Company, 308 So.2d 784 (La.1975); Campbell v. Mouton, 373 So.3d 237 (La.App. 3d Cir. 1979); Joiner v. Downing, 383 So.2d 93 (La.App. 3d Cir. *903 1980). The test used for evaluating a motion for directed verdict in the federal jurisprudence is found in the U.S. Fifth Circuit case of Boeing Co. v. Shipman, 411 F.2d 365 (5th Cir. 1969), wherein it is set forth as follows:
"`On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence-not just that evidence which supports the non-mover's case-but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury.'" [our emphasis]. Id. Campbell, supra, at 239.
The opening statement of defendant's attorney to the jury acknowledging that Traders provided liability coverage for defendant Sawyer was in the nature of a judicial admission and establishes this coverage sufficient to justify the trial court's action in overruling the insurer's motion for summary judgment, even though plaintiff offered no other evidence of the insurance coverage.
The testimony of plaintiff and his witness, Denkins, of the absence of any safety devices in the drilling program to protect them in the event gas was unexpectedly encountered, provides evidence "of such quality that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions" as to the existence of negligence on the part of Sawyer that caused plaintiff's injuries, and for this reason the trial judge was correct in overruling Sawyer's and his insurer's motion for directed verdict.
WAS THE JURY CLEARLY WRONG IN CONCLUDING PLAINTIFF'S INJURY WAS CAUSED BY THE NEGLIGENCE OF SAWYER, PRESIDENT OF PLAINTIFF'S EMPLOYER?
For there to be liability in an executive officer's suit the employer must have a duty to the plaintiff which has been delegated to an executive officer who has breached the duty and brought about plaintiff's injuries. Canter v. Koehring Co., 283 So.2d 716 (La.1973). In this decision the court recognized that actionable negligence is based upon general tort principles:
"The failure to act as required by the employment duty may deprive the third person of a protection owed him by the principal or employer, and such risk of harm because of the breach may have been reasonably foreseeable. Thus, the breach of the duty imposed by the employment or agency relationship may, under general tort principles, be actionable negligence because of the creation or maintenance thereby of an undue risk of harm to others." Id. at 722.
In the decision of Smolinski v. Taulli, 276 So.2d 286 (La.1973), the supreme court defined actionable negligence as follows:
"Actionable negligence results from the creation or maintenance of an unreasonable risk of harm to others." Id. at 288.
The general tort principles require those who handle combustibles to use a high or extraordinary degree of care. Surry v. Arkansas Louisiana Gas Company, 170 So.2d 133 (La.App. 2d Cir. 1964); Gregory v. Guarisco, 320 So.2d 354 (La.App. 2d Cir. 1975). This rule of law was applied to an executive officers suit in the case of Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir. 1978), wherein an employee injured in a dynamite blast recovered from an executive officer. The court quoted with approval from Gregory, supra, at p. 559:
"The general tort principle obviously applicable to this case is that `those who use or handle dangerous agencies, substances or instrumentalities such as explosives, electricity, firearms, combustibles and *904 fireworks, which might endanger persons or property, are held to a high degree or extraordinary degree of care.'"
In the supreme court case of Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395 (1963), the court made the following statement regarding natural gas:
"In Raphael Brothers v. Cerophyl Laboratories, 211 La. 354, 30 So.2d 116, this Court adopted the following succinct statement of the law pertaining to natural gas:
`Natural gas, because of its highly inflammable and explosive character, is an inherently dangerous instrumentality. Those who handle and distribute it are charged with the duty to exercise that degree of care commensurate with its dangerous character and necessary to protect the public from any foreseeable injury therefrom.'

This principle was reiterated in Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627, wherein we stated:
`* * * Those who handle and distribute a highly inflammable gas are charged with the duty to exercise a degree of care commensurate with its dangerous nature and necessary to protect the public from any foreseeable injury therefrom.'" Id. at 398-399.
Plaintiff's employer had a duty to provide him with a safe place to work. LSA-R.S. 23:13[1]. Plaintiff's employer had delegated this duty to its President, defendant Sawyer, who set up the program for drilling the well where plaintiff was injured. The method established for drilling this well made no provisions for safety of the drilling crew in the event that gas was encountered in the drilling of the well before it reached a depth of 1800 ft., at which time presumably a gas detection unit and blowout preventers would have been installed.
The testimony of plaintiff and his co-worker and the reasonable inferences therefrom provide a substantial basis for the jury to have reached the following conclusions:
A. If conductor pipe had been installed with a gas detection system at the commencement of the drilling of the well, plaintiff and his co-workers would have been earlier warned of gas and probably have had time to have cut off all the machinery and thereby prevented the explosion and fire, and
B. If the conductor pipe had been installed equipped with the blowout preventers without the gas detection system plaintiff and his co-workers by the use of the blowout preventers would have had sufficient time to shut off or reduce the volume of the escaping gas to have stopped the drilling machinery and avoided the fire and explosion.
The testimony of plaintiff and his witness as to the function of the conductor pipe and the blowout preventers for controlling the gas that they encountered is corroborated by the action of Sawyer in requiring conductor pipe and blowout preventers at the commencement of the drilling of the next four wells, which were drilled in the area of the well where plaintiff sustained his injury. While defendants offered some evidence tending to question the value of the conductor pipe equipped with blowout preventers in preventing a disaster similar to the one which here occurred, we conclude this evidence was entitled to little or no weight in light of the defendants' use of these very safety devices on four wells subsequently drilled by them, and for that reason the jury was justified in rejecting it.
The principal thrust of defendants' contention that Sawyer was guilty of no negligence *905 was based upon his prior investigation which revealed no gas or other drilling problems existed in the area above a depth of 3500 feet. Sawyer and his witnesses testified that where no gas was anticipated, the custom was not to install conductor pipe equipped with a blowout preventer.
While neither plaintiff nor defendant offered expert testimony as to the certainty or uncertainty of the existence of gas at varying depths under the earth, we observe that it is generally known that the determination of the existence of gas, the quantity of it, and its depth and pressure is far from an exact science.
The evidence established that the well was being drilled in a known gas field where production had been found at depths as shallow as 5500 feet and that Sawyer planned to install the blowout preventer, which was on location, at 1800 ft.
There was also evidence that Gulf Oil Company, as well as other operators who had employed the services of plaintiff's employer to drill wells, sometimes required the installation of the conductor pipe and blowout preventers at the inception of the well. There was no evidence that these third parties only used these safety devices when approaching known shallow gas deposits.
There are numerous decisions in our jurisprudence where practices that were customarily used in the drilling of oil and gas wells were found to be unsafe and those that engaged in them found to be negligent.
In the case of Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627 (1952), the well drilling company contended the manner in which it installed a butane tank and a gas line running from it in the proximity of a board flooring installed at the drilling site was not negligence because the installation was done in a common and customary manner accepted in oil field operations. The court there rejected this contention with the following statement, to-wit:
"Harris Drilling Company contends, however, that it was the custom in oil field operations of this nature to place the butane tank and the pipeline therefrom in close proximity to the turnaround, that there was nothing unusual in the manner of its installation in this case, and that this custom or manner of installation should be considered by the court in determining the question of negligence, as it establishes that the drilling company was acting properly and prudently.
Custom and usage may be regarded as a matter proper for consideration in determining whether or not sufficient care has been exercised in a particular case, but it is not conclusive or controlling, for the customary way of doing a thing may be a negligent way and may create a false standard of care, and, once negligence is established, such negligence cannot be justified by custom." Id. at 629-630.
In the decision of Pennington v. Justiss-Mears Oil Company, 123 So.2d 625 (La.App. 1st Cir. 1960), wherein plaintiff's husband was killed by a drill stem which fell through a drilling rig which was open on one side, the defendant contended that it was not negligent in failing to provide a belly-band enclosing the open side of the rig, which would have prevented the pipe from falling from it because it was standard practice in the industry not to so equip open sided drilling rigs. The court rejected the contention and approved the following statement with regard to the proper consideration to be given customary practices:
"`Custom and usage may be regarded as a matter proper for consideration in determining whether or not sufficient care has been exercised in a particular case, but it is not conclusive or controlling for the customary way of doing a thing may be a negligent way and may create a false standard of care, and, once negligence is established, such negligence cannot be justified by custom.'" [emphasis added]. Id. at 632.
In the decision of Larned v. Wallace, 146 So.2d 434 (La.App. 3d Cir. 1962), the defendant, whose tongs had fallen and injured plaintiff after they were disconnected from the well rig preparatory to being removed from the rig, contended that the manner in which it performed the operation of disconecting *906 the tongs was one not negligent because the system was one used customarily for the performance of removal of the tongs. The court rejected this contention and made the following statement:
"The defendant argues that Roy's method of removing the tongs is frequently used in the oilfields and therefore no negligence can be charged to him for following this customary practice. We agree the evidence shows this was a customary way of removing tongs but the evidence likewise shows, as pointed out above, that it was not considered customary or safe to raise a heavy object over a man's head without warning. Furthermore, the law is well established that although custom may be considered in determining whether sufficient care has been exercised, it is not conclusive or controlling, because the customary way of doing a thing may be a negligent way, and may create a false standard of care. Once negligence is established, it cannot be justified by custom." [citations omitted]. Id. at 438.
In the U.S. Fifth Circuit Court of Appeals case of McCormack v. Noble Drilling Corp., 608 F.2d 169 (5th Cir. 1979), the jury rejected defendant's contention that the manner in which it made another drill stem connection with the drill stem at the top being secured only by a roughneck holding it with his hands, rather than securing it by use of available mechanical devices known as elevators, was not negligence because it was a common practice in the industry. The court there made the following statement with regard to this issue:
"Fn. 8. On the issue of whether Noble's procedure was necessarily reasonably safe because the industry commonly ran casing in the same manner, the court instructed the jury as follows:
The fact that a defendant conducted its operations in a manner similar to [that] used by other companies is relevant to your consideration of its negligence, but that fact is not conclusive as to whether or not [the defendant] was guilty of negligence... [I]t remains for you to determine, from all of the evidence, whether the method being used at the time of plaintiff's injury was in fact reasonably safe.
The court's instruction was proper. "[W]hat ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." Texas & Pac. Ry. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903); see B & B Insulation, Inc. v. Occupational Safety & Health Review Comm'n, 583 F.2d 1364, 1370 (5th Cir. 1978); W. Prosser, Law of Torts § 33 at 168-69 (3rd ed. 1964); Restatement (Second) of Torts § 295A, comment c (1965).
No group of individuals and no industry or trade can be permitted, by adopting careless and slipshod methods to save time, effort, or money, to set its own uncontrolled standard at the expense of the rest of the community. If the only test is to be what has always been done, no one will ever have any great incentive to make any progress in the direction of safety. It follows, therefore, that whenever the particular circumstances, the risk, or other elements in the case are such that a reasonable man would not conform to the custom, the actor may be found negligent in conforming to it; and whenever a reasonable man would depart from the custom, the actor may be found not to be negligent in so departing." Id. at 174.
The scope of our appellate review of the jury's factual conclusion is set forth in the following quote from Canter v. Keohring Co., supra, at p. 724:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, *907 even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts."
We conclude the testimony of plaintiff and his witness, Denkins, to the effect that the conductor pipe, blowout preventer, and gas detection device should have been placed upon the well, together with statements by defendants' witnesses that they sometimes use these safety devices and knew other operators that require them, provides a reasonable factual basis for the jury's finding of negligence.
In view of the extraordinary care required of those handling natural gas, the custom of using safety devices for protection against gas only when approaching a known location of gas is an unsafe and negligent practice, as stated in Harris Drilling Co. v. Delafield, supra:
"... The customary way of doing a thing may be a negligent way of doing a thing and may create a false standard of care..." Id. 60 So.2d at 630.
The jury's conclusion is not clearly wrong because it refused to exonerate Sawyer of negligence based upon defendants' evidence that it is a custom of the industry not to use these safety devices until the well is approaching a depth of known gas location. The evidence established that gas in this field was not all located at one depth as it had been found at depths ranging from 5500 feet to 7200 feet, and the well which blew out had a contract drilling depth of 9000 feet. The jury was entitled to conclude that there exists a foreseeable risk of harm from unexpected natural gas at shallow depths when drilling in a known gas field, even though it has never been encountered there before.
WAS TRADER'S & GENERAL INSURANCE COMPANY ENTITLED TO A CREDIT IN THE JUDGMENT RENDERED ON THE $225,000 JURY AWARD FOR COMPENSATION AND MEDICAL EXPENSES PAID TO PLAINTIFF?
During the trial an affidavit was filed into evidence and read to the jury establishing that Traders had paid $20,702.64 to plaintiff in workmen's compensation benefits and paid medical expenses on plaintiff's behalf in the amount of $8,556.82. Included within the trial judge's instruction to the jury was the following instruction:
"Finally, if there should be a judgment rendered in favor of Eullis H. Johnson, you must render judgment likewise in favor of Traders and General Insurance Company, on their intervention claim for workmen's compensation benefits, and medical expenses paid to date to Mr. Johnson or on his behalf, in the amount of $20,702.64, and $8,556.82 respectively."
The Forms of Verdicts delivered to the jury by the judge at the time the jury retired for deliberation contained the following statement:
"If you find a verdict in favor of plaintiff against either of the above defendants, you must also grant to the defendant, Traders and General Insurance Company, a credit for the Workmen's Compensation paid Plaintiff, totaling $20,702.64, and medical expenses of $8,556.82."
When the jury returned, the Forms of Verdicts to the court it set forth therein:
"Verdict for Plaintiff, Eullis H. Johnson, for the sum of $225,000 dollars, against the defendants:
(a) Ronald L. Sawyer;
. . . . .
(c) Traders and General Insurance Company."
The jury on the reverse side of the Forms of Verdicts placed there the following statement:
"We the jury find Mr. Sawyer neglient [sic] by a vote of 10-2. We hereby award Mr. Johnson the sum of $225,000 to be paid by Mr. Sawyer and Traders and General *908 Insurance Company." [our emphasis].
Evidence of the compensation and medical expenses paid by Traders to plaintiff was placed before the jury. The jury received specific instructions from the judge that Traders was to receive a credit for this amount so paid. We must therefore conclude that the jury at the time of their deliberations gave Traders the required credit, and the statement placed upon the verdict by the jury that the $225,000 was to be paid to plaintiff by Mr. Sawyer and Traders establishes conclusively that they had given credit against the sum to which they considered plaintiff was entitled, and that they were ordering the balance remaining after the credit deduction had been applied, i. e., $225,000, be paid to the plaintiff. Because the jury had given the credit as they were instructed to do, the trial judge erred when he again gave the credit in the formal judgment which was signed based upon the jury verdict. The effect of the trial judge's actions was to give twice unto Traders & General Insurance Company credit for compensation benefits and medical benefits paid by it for and on behalf of plaintiff.
IS TRADERS & GENERAL ENTITLED TO A CREDIT FOR COMPENSATION PAYMENTS MADE SUBSEQUENT TO TRIAL AND PRIOR TO THE SATISFACTION OF THE JUDGMENT AND IS IT ENTITLED TO A CREDIT AGAINST THE JUDGMENT FOR COMPENSATION OBLIGATIONS ACCRUING SUBSEQUENT TO ITS SATISFACTION?
Traders and General Insurance Company is entitled to a credit against the judgment for sums paid by it in compensation to the plaintiff in excess of the $20,702.64 that had been paid up to the time of the commencement of the trial of the case; and it is further entitled to a credit against all future weekly workmen's compensation obligations accruing to plaintiff from Traders against that portion of the judgment remaining after Traders has received credit for additional sums actually paid, up to the extent of plaintiff's remaining judgment. LSA-R.S. 23:1101 et seq.; Fontenot v. Hanover Ins. Co., 378 So.2d 461 (La.App. 3d Cir. 1979), 385 So.2d 238 (La.1980).
In order to conform the judgment rendered herein to our decision with regard to the credit to which Traders is entitled, we RECAST the third paragraph of the judgment to read as follows:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Traders and General Insurance Company is hereby granted a credit against the judgment hereinabove awarded to plaintiff in the amount of all weekly workmen's compensation benefits paid by it to plaintiff between trial date and the date of satisfaction of this judgment, and said Traders and General Insurance Company shall also have credit against all future accruing weekly workmen's compensation obligations owed by it to the plaintiff to the amount of said judgment remaining after Traders and General Insurance Company has received the credit herein provided for the sums actually paid by it to plaintiff in weekly compensation.
The judgment appealed from as AMENDED by our recasting the third paragraph thereof is AFFIRMED at appellants' cost.
NOTES
[1] LSA-R.S. 23:13-"Every employer shall furnish employment which shall be reasonably safe for the employees therein. They shall furnish and use safety devices and safeguards, shall adopt and use methods and processes reasonably adequate to render such employment and the place of employment safe in accordance with the accepted and approved practice in such or similar industry or places of employment considering the normal hazard of such employment, and shall do every other thing reasonably necessary to protect the life, health, safety and welfare of such employees..."